**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
KIM MARSHALL,

                       Plaintiff,

     - against -

WESTCHESTER MEDICAL CENTER
HEALTH NETWORK,
CARLOS ROBINSON, and
VANESSA MACKAY
                      Defendants.
--------------------------------------------------------X

Case No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, KIM MARSHALL, (hereinafter "Plaintiff" or "Ms. Marshall"), by her attorneys, FILIPPATOS PLLC, hereby complains of Defendant, WESTCHESTER MEDICAL CENTER HEALTH NETWORK ("Defendant" or "WMCHN"), Defendant CARLOS ROBINSON ("Defendant" or "ROBINSON") and Defendant VANESSA MACKAY ("Defendant" or "MACKAY") upon personal knowledge, as well as information and belief, by alleging and averring as follows:

**PRELIMINARY STATEMENT**

1.     This is a case against Westchester Medical Center, a well-regarded health-care provider, and a pillar in our community that should know better, who has discriminated and retaliated against a member of the disabled community, a community it has sworn an oath to care for, treat, and heal. Indeed, despite claiming to be a diversity-minded enterprise, Westchester Medical Center has set an exceptionally low bar when it comes to accommodating, or even tolerating, employees with disabilities. Ms. Marshall, an exemplary employee, who consistently received positive performance reviews and went above and beyond her duties, was targeted and

discriminated against not once, but twice, after she requested two separate FMLA leaves to reasonably accommodate her severe symptoms of arthritis, such that she was ultimately fired.

2.      Plaintiff brings this action alleging that Defendants have violated the Family and Medical Leave Act, 29 U.S.C. §§ 2601, *et seq*. ("FMLA"), and the New York State Executive Law, §§ 296 *et seq.* ("NYSHRL"); therefore, Plaintiff seeks damages to redress the injuries she has suffered as a result of: (a) interference with, and retaliation for exercising, her rights under the FMLA by requesting a reasonable accommodation for her disability; and (b) discrimination based on Plaintiff's disability, retaliation, as well as the unlawful aiding and abetting of such, under the NYSHRL.

3.      As is more fully alleged herein, Defendants unlawfully retaliated against Plaintiff shortly after she returned from FMLA leave by refusing to reasonably accommodate her disability and by placing her on an unfounded Performance Improvement Plan.  Moreover, when Plaintiff subsequently requested an additional FMLA leave as a reasonable accommodation, she was abruptly terminated. Defendant's unlawful termination of Plaintiff's employment constitutes a violation of the applicable federal and state statutes cited herein; accordingly, Plaintiff seeks the full panoply of relief provided by these statutes in her Complaint.

## JURISDICTION AND VENUE

4.      Jurisdiction of this Court is proper under 29 U.S.C. § 2617 and 28 U.S.C. §§ 1331.

5.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims contained in this action, which are within the original jurisdiction of the Court, that they form part of the same case or controversy under Article III of the United States Constitution.

6.      This Court has personal jurisdiction over Defendants because Defendants are found, resides, or transacts business in the Southern District of New York.

7.      Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) because Defendant conducts business, and some or all of the actions or omissions giving rise to Plaintiff's claims occurred, within this judicial district.

## PARTIES

8.      At all times relevant hereto, Plaintiff is a resident of the State of New York and County of Orange.

9.      At all times relevant hereto, Defendant WESTCHESTER MEDICAL CENTER HEALTH NETWORK was and is a domestic for-profit corporation duly existing pursuant to, and by virtue of, the laws of the State of New York and maintains its principal place of business at 100 Woods Road, Valhalla, NY.

10.      Defendant WESTCHESTER MEDICAL CENTER HEALTH NETWORK is a regional trauma center that provides health services to residents of the Hudson Valley, which, upon information and belief, employs over 7,000 individuals on a full-time or full-time equivalent basis and thus is subject to all statutes upon which Plaintiff is proceeding herein.

11.      At all times relevant hereto, Plaintiff was a full-time employee of Defendant WESTCHESTER MEDICAL CENTER HEALTH NETWORK, working in excess of 1250 hours annually.

12.      At all times relevant hereto, Defendants ROBINSON and MACKAY were employees of Defendant WESTCHESTER MEDICAL CENTER HEALTH NETWORK, holding the positions of Regional Director of Patient Access and Vice President of Revenue Cycle, respectively.

13.     At all times relevant hereto, Defendants ROBINSON and MACKAY were Plaintiff's supervisors, and as such, had authority to hire, terminate, and/or affect the terms and conditions of Plaintiff's employment.

14.     The defendants recited separately immediately hereinabove are sometimes referred to collectively as "Defendants" hereinbelow.

<u>**ADMINISTRATIVE PREREQUISITES**</u>

15.     Prior to this filing, Ms. Marshall filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 18, 2022.

16.     On September 7, 2022, the New York Field Office of the EEOC confirmed that the charge has been processed and was assigned charge number 520-2022-07698.

17.     Once the EEOC completes its investigation into Ms. Marshall's Charge of Discrimination and/or issues Ms. Marshall a Notice of Right to Sue, Ms. Marshall will seek leave to amend this Complaint to assert causes of action under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, *et seq.*, as amended by the ADA Amendments Act of 2008, Pub. L. No. 110-325 ("ADAA").

18.     Any and all other prerequisites to the filing of this suit have been met.

<u>**SUMMARY OF LEGAL CLAIMS**</u>

I.    **Family Medical Leave Act ("FMLA") Protects against Employer Interference and Retaliation 29 U.S.C. §§ 2615 and 2617**

19.     Section 2615 of the FMLA provides protection against retaliation and interference by an employer.

20.     "It shall be unlawful for any employer to interfere with, restrain, deny the exercise of or the attempt to exercise, or retaliate against an employee for the exercise of any right" provided under the FLMA. 29 U.S.C. § 2615(a)(1).

21.     "It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2).

22.     Section 2617 of the FMLA provides private rights to individuals to enforce FMLA protections.

23.     "Any employer who violates section 2615 of this title shall be liable to any eligible employee affected for damages equal to the amount of any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; or in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee, any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care, up to a sum equal to 12 weeks (or 26 weeks, in a case involving leave under section 2612(a)(3) of this title) of wages or salary for the employee." 29 U.S.C. § 2617(a)(1)(A).

24.     Violation of the FLMA also subjects Defendants to liquidated damages and front pay, *see* 29 U.S.C. section 2617(a)(1)(A)(iii) and (a)(1)(B), because Defendants cannot show that Defendants' action were in any way, shape, or form taken in "good faith" and on "reasonable grounds." As will be shown, Defendants actions were malicious and in wanton disregard of the FMLA.

25.     An action to recover the damages or equitable relief may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by

any one or more employees. The Court in such an action shall, in addition to any judgment awarded to the Plaintiff, allow a reasonable attorney's fee, reasonable expert witness fees, and other costs of the action to be paid by the Defendant.

## II. New York State Human Rights Law ("NYSHRL") Protects Against Employer Discrimination and Retaliation on the Basis of Disability, and the Aiding and Abetting of Such

26.     Section 296 of the NYSHRL makes it unlawful for an employer to discriminate on the basis of an "individual's age, race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, **disability**, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence… or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a).

27.     Section 296(7) of the NYSHRL further provides that it is "unlawful discriminatory practice for any person engaged in any activity to . . . retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article." N.Y. Exec. Law § 296(7).

28.     Moreover, "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." N.Y. Exec. Law § 296(6).

## SPECIFIC FACTUAL ALLEGATIONS

## I. Plaintiff's Illustrious Career in the Healthcare Management Industry

29.     Plaintiff joined Westchester Medical Center Health Network via Northeast Provider Solutions in 2019 with over 14 years of experience in healthcare and hospital management.

30.     After graduating in 1985, with a degree from Morse School of Business in Medical Administration, Ms. Marshall began her career at St. Luke's Cornwall Hospital in Newburgh, NY, with subsequent roles of increasing responsibility in healthcare access management. Over the course of eight years, she worked her way up in the hospital, and eventually oversaw a staff of forty employees, including teams in the departments of finance/revenue cycle, emergency room registration, admitting, and scheduling.

31.     Subsequently, Ms. Marshall earned her Bachelor's degree in Organizational Management from Nyack College in 2013, and landed successful managerial roles at Health-Quest, where she oversaw a staff of thirty employees working to ensure that each patient was financially cleared before their scheduled procedure, as well as Nthrive, where she served as the ARS Services project manager overseeing a staff of fifteen internal employees and forty global employees who managed a business office for outsourced client services.

## II.     Plaintiff Joins Westchester Medical Center Health Network as a Patients Account Manager and Quickly Takes on More Responsibility

32.     On or about June 10, 2019, Plaintiff joined WMCHN, as a Patients Account Manager (Valhalla), and was given substantial responsibilities, which she performed with great skill and success. Specifically, Ms. Marshall was tasked with overseeing a staff of four direct reports and a team of approximately 50 in handling accounts receivables. Among other duties, Ms. Marshall identified trends and offered process improvements to assure claims were successfully worked to resolution. She also oversaw the payer escalation process, and monitored high dollar cases for payment, and supervised customer service for financial assistance and self-pay accounts.

33.     In October 2019, Ms. Marshall was elevated to the role of Patient Access Manager (Poughkeepsie), by Arlene Ligos ("Ms.Ligos"), Patient Access Director; a position in which Ms. Marshall was responsible for overseeing the daily functions and operation of pre-registration, insurance verification, scheduling, authorization and financial counseling for both inpatient and outpatient services at Westchester Medical Center ("WMC") and Mid-Hudson Regional Hospital ("MHRH").   In this regard, Ms. Marshall was presented with an increase in responsibility, commensurate with her acknowledged skillset and extensive experience.

34.     Plaintiff was required to hold both positions for several months, until finally, in March 2020, when the COVID pandemic hit, she was permanently moved to Patient Access in Poughkeepsie and two new employees were hired to fill the Patients Account Manager role in Valhalla.  Ms. Marshall did not receive any additional compensation for conducting both roles for almost six months, but her effort and success did not go unnoticed.

35.     On December 20, 2019, Ms. Marshall received her first performance appraisal, in which she was held to "meet/exceed expectations." Regarding her job responsibilities, Ms. Marshall was rated "successful," with her manager at the time, Patrick Baker ("Mr. Baker"), who noted: "Kim has met and in many cases exceeded the expectations for the role of AR Manager. She completed her required health and online requirements on time and conducts herself in a professional manner." Mr. Baker wrote that "Kim has displayed a strong work ethic and demonstrates the skills needed to resolve interpersonal conflicts and works to ensure department compliance as well as working tirelessly to improve department morale and interhospital communications." Furthermore, "Kim has shown ability to manage and motivate direct reports and to assist management staff with necessary meetings and resources to improve oversight and communication with staff." Lastly, Mr. Baker lauded her communication skills, "Kim maintains

verbal and written communications of all necessary and appropriate instances in the department with regard to meeting minutes, staff memo's, etc. She keeps the staff informed of policy changes or responsibility changes."

36.     Overall, Ms. Marshall's accomplishments were unquestioned: "Kim has reached and in many cases exceeded the performance expected of her. She continues to be a positive force in the department and strives to seek out new and innovative ways to improve the interdepartmental morale and processes."

37.     Once the COVID pandemic hit in early 2020, like many in the healthcare industry, Ms. Marshall was faced with additional, albeit unforeseen, responsibilities. While maintaining her normal hospital activities and registrations, Ms. Marshall and her staff were required to provide coverage for COVID testing tents and, later, the off-site vaccination "pods," often on short notice and at the risk of leaving other areas not appropriately covered.  Ms. Marshall was tasked to hire additional temporary staff, maintain their schedules and time cards, and manage the growing team to ensure productivity was not compromised.

38.     Plaintiff voiced a concern to Vanessa Mackay ("Ms. Mackay"), Vice President of Revenue Cycle, that her staff was spread too thin, but Ms. Mackay told Plaintiff to "make it work." Following this directive, Ms. Marshall worked diligently, juggling her new tasks without receiving compensation for these additional duties, or ever being made aware that her performance was anything but positive.

39.     In June 2021, Ms. Marshall's immediate supervisor, Ms. Ligos, took a new position elsewhere and was replaced by Carlos Robinson ("Mr. Robinson"), Regional Director of Patient Access.

**III.** **Plaintiff Applies for FMLA Protected Leave, and Seeks Reasonable Accommodation for Her Disability, Only to Return to Work and Be Given a Retaliatory and Unfounded Negative Performance Evaluation**

40.     Ms. Marshall has suffered from debilitating arthritis for approximately ten years and was first diagnosed by Dr. Kenneth Rauschenbach in 2011.  Her pain was chronic and constant, making it exceedingly difficult for her to get dressed, walk distances, and sleep because of her marked lack of mobility and severe pain. Ms. Marshall also began to experience a lack of energy due to her sleeplessness and was taking daily pain medication (Meloxicam and Tylenol) in addition to various dietary supplements.

41.     On or about June 28, 2021, Plaintiff sought, and was granted FMLA-protected leave from August 9, 2021, through October 4, 2021, in order to reasonably accommodate her disability (arthritis) with a total right hip replacement.

42.     While Ms. Marshall was out on leave, she received requests from Mr. Robinson and Ms. MacKay to assist with tasks such as finding data for the FC conversion rates for WMC and MHRH. Plaintiff dutifully complied, despite being out on leave, and under doctor's orders to rest.

43.     Upon her return to work, on October 7, 2021, it was evident to Ms. Marshall that her new supervisor, Mr. Robinson, as well as Ms. Mackay, were discriminating and retaliating against her due to her disability, and because she had availed herself of protected leave as a reasonable accommodation of same.

44.     On November 30, 2021, several weeks after returning from FMLA-protected leave, Ms. Marshall received a performance appraisal, in which she was found to "meet expectations." Mr. Robinson noted that she was "successful" regarding all three categories listed on the evaluation, (1) job responsibilities, (2) evaluation of respected standards of behavior, and (3)

management standards. Within the subsets of management standards, Mr. Robinson also rated Ms. Marshall as "successful" for (a) leadership, (b) accountability and (c) communication.

45.     Only within the staff management subset, did Mr. Robinson note that Ms. Marshall "needs improvement," and even here, Mr. Robinson provided only vague criticisms. The first being that "a few processes that have fallen through the cracks," yet without providing further detail.  Indeed, ultimately, Mr. Robinson noted that Ms. Marshall was "addressing" Those alleged lapses. Mr. Robinson also pointed out that he had received "staff complaints of [Ms. Marshall] being unfair and demonstrating favoritism," and again without providing more details about the supposed inconsistent disciplinary process, he also noted that Ms. Marshall had "assured me that this is not the case." He reiterated that it is "important to avoid the appearance. Kim is actively working on this and I look forward to her continued improvement."

46.     Strengthening the sentiment that Ms. Marshall's overall performance was successful, Mr. Robinson noted her continuing desire to work hard and strive for perfection: "Kim eagerly performs tasks assigned and wants to improve. This is an important attribute for a leader." Ms. Marshall was happy to be evaluated as "successful," but wanted more clarification regarding the ambiguous concerns listed in the staff management subsection of her performance evaluation. As a result, she requested bi-weekly meetings with Mr. Robinson to ensure that she had a direct line of communication with him and that he could remain confident in her ability to lead. Ms. Marshall made it clear she would accept any and all feedback, and suggested they meet in order to strategize how to achieve the following goals:

> For 2022, we will focus on increasing upfront collections, having better data with the implementation of the CHC products, increased registration integrity (quality scores), streamlining operations, improving communication and relationship with WMC to ensure that both facilities have the same policies and processes (including having staff at both campuses use each other as resources).

47.     Indeed, prior to her FMLA leave, neither Mr. Robinson nor any other Supervisor, ever mentioned that they were unhappy with Plaintiff's performance. Nevertheless, over the next two months, at Ms. Marshall's insistence, she and Mr. Robinson met several times to discuss the stated goals on her performance evaluation. During each meeting, Plaintiff provided her Supervisor with updates and discussed any new issues or questions that arose. Mr. Robinson failed to ever apprise Ms. Marshall of any work-related concerns he had or provide her with feedback on how she could improve her performance.

### IV.   While at Work, Ms. Marshall Continues to Openly Experience Symptoms Related to Her Disability, Yet is Offered No Reasonable Accommodation by Any of Her Supervisors

48.     On or about December 9, 2021, while working at Mid Hudson Regional Hospital, Ms. Marshall experienced severe stomach pains, nausea and blood in her stool, requiring her to leave work. Ms. Marshall immediately notified Mr. Robinson of her medical emergency and was seen by gastroenterologist, Dr. Dean Cassimatis.

49.     Dr. Cassimatis suggested that Ms. Marshall cease taking Meloxicam for her arthritis, as this was a potential cause of the bleeding. Ms. Marshall was then scheduled for a colonoscopy on December 17, 2021, after which she was diagnosed with a bleeding ulcer and prescribed Omeprazole.

50.     On or about December 14, 2021, when Ms. Marshall had ceased taking Meloxicam for her arthritis out of fear that it was causing internal bleeding, she had difficulty walking at work and fell outside of the hospital while speaking with fellow employee, Bernice Boyce, Coordinator ("Ms. Boyce"). As a result, Ms. Marshall badly twisted her leg, which severely exacerbated her

arthritis pain in her left hip. Soon thereafter, Ms. Marshall began to speak to her doctor about scheduling a second surgery for a hip replacement.

51.     Ms. Marshall's arthritis diagnosis, and the severity of her symptoms, especially given the fact that she had ceased taking Meloxicam, was widely known by Mr. Robinson and Ms. MacKay.

52.     Nevertheless, neither Mr. Robinson nor Ms. MacKay ever engaged in an interactive process to discern whether a reasonable accommodation would permit her to better perform her job functions.

## V.   Ms. Marshall Receives a Discriminatory and Retaliatory Performance Improvement Plan ("PIP") After She Engages in Protected Activity

53.     Subsequently, on January 28, 2022, Plaintiff was blind-sided when she was placed on a Performance Improvement Plan ("PIP"), despite never having received a negative performance review or even a previous warning in the bi-weekly meetings with Mr. Robinson. In fact, to the contrary – as mentioned, *supra*, Ms. Marshall received stellar performance evaluations prior to the instant PIP. The thirteen areas of focus, as well as Ms. Marshall's objections are summarized below:

    i.   Items had "fallen through the cracks," and Ms. Marshall must obtain 100% Important Messages from Medicare ("IMMs") and 100% consents.
        a.  <u>Objection/Response:</u> Ms. Marshall's counterpart at WMC, Ms. Virginia Grogan ("Ms. Grogan"), reported to Mr. Robinson and Ms. Mackay that she did not have 100% completion rate of IMMs and consents, but was not put on a PIP. Nevertheless, Ms. Marshall received the report and provided a summary for Ms. Mackay, demonstrating improvement on February 3, 2021.

    ii.  Ms. Marshall "creates processes but does not have a means of measuring your processes for consistent desire outcomes." For example, regarding the "pediatric consent process discussed with Vanessa January 25, 2022," "Obtaining consents is a requirement 100% of the time."
        a.  <u>Objection/Response:</u> Ms. Marshall had met with Dr. Sung and Joline Frey in January to discuss the challenges and come up with resolution to pediatric consents. On January 28, 2022, Ms. Marshall emailed a monitoring update

> to Mr. Robinson and Ms. Mackay showing the improvement in the process; neither responded.

iii.   Ms. Marshall must "understand and demonstrate knowledge of the operational flows in all of her areas to ensure that all operations are the same (as much as possible) between WMC and MHRH."

    a.  <u>Objection/Response:</u> Ms. Marshall is apprised of operations at both locations, however, the processes are not always 100% the same due to differences in services and patient population between the two hospitals.

iv.   Ms. Marshall must "articulate what is going on with her teams and identify ways that will make operations more efficient and effective." For example, "if we have vendors working cases like NF and WCs, the FCs should allow the vendors to work them so they can focus on higher priority cases…we spoke about that the week of 1/10/2022." Another example "concerns the outsourcing of OP accounts to QB," particularly that there was a low volume. A third example was that "Vanessa has stated numerous times that someone should be stationed in the ED and we have been told by ED that is not the case."

    a.  <u>Objection/Response:</u> The decision to include the NF/WC cases to the FC worklist was made by Ms. Marshall's prior director and Ms. Mackay. Ms. Marshall had articulated that it would be better for her staff to look at them. Ultimately, Ms. Mackay agreed with Ms. Marshall, and on January 21, 2022, she changed her previous decision about the NF and WC and requested that they be reviewed by the FC's. As to the second example, Ms. Marshall's team was referring cases much quicker than had been done in the past, and on January 20, 2022 she had emailed Mr. Robinson and Ms. Mackay about this increase in volume referred; neither responded. As to the third example, Ms. Marshall countered that she was never told this, and furthermore, she did assign an FC to ER cases but that there was not a physical location in the ER for them to sit.

v.   Ms. Marshall and her team must be "more engaged during meetings/calls." For example, "everyone must understand how what we're meeting about affects their area and provide input."

    a.  <u>Objection/Response:</u> Ms. Marshall had expressed to all her coordinators the need to be more engaged in calls and not multi-task during meetings, and she saw an improvement with Jennifer Harrington ("Ms. Harrington"), Supervisor, as well as Ms. Boyce; Victor Fermin ("Mr. Fermin"), Coordinator, was new, so he was only listening.

vi.   Ms. Marshall must "develop a plan to deal with complaints from staff."

    a.  <u>Objection/Response:</u> Ms. Marshall always addressed staff concerns brought to her by personally meeting with onsite staff or scheduling a meeting/phone call for those off-site.

vii.   Ms. Marshall must "ensure Bernice is working 3pm-11pm."

    a.  <u>Objection/Response</u>: On January 31, 2022, Ms. Marshall addressed this matter with Mr. Robinson via email, to which he did not respond. Ms. Marshall again raised this matter via a phone call, in which she explained that Ms. Boyce was placed on the day shift due to lack of support. Mr. Robinson relayed this to Ms. Mackay, who agreed to the switch.

viii.   Ms. Marshall did not follow directions by sending out the AIM file by the 9:15am deadline on January 19, 2022.

    a.   <u>Objection/Response</u>: Ms. Marshall tried running the report the day before and the system was not working properly. Once Ms. Marshall was able to pull the file on January 19, she completed her due diligence to ensure that it was correct before sending it.

ix.   Ms. Marshall must "ensure [she] and [her] leadership are listening when employees are talking as they may not use key words." For example, Gina T. "did not use the words 'I need an accommodation' but there were red flags in her conversation."

    a.   <u>Objection/Response</u>: Ms. Marshall had much different conversation with Gina T. than Mr. Robinson had. On August 6, 2021, the day before Ms. Marshall's FMLA leave, Gina Taddeo ("Ms. Taddeo"), Registrar, asked Ms. Marshall if she could work overtime and volunteer for more shifts, because she desperately needed the money. However, Ms. Taddeo was often a no show for her scheduled shifts, and frequently called out for reasons such as the death of her cat and a family member's birthday party. Indeed, Ms. Taddeo was on her third and final written warning for missing over 200 hours of work. In light of this, Ms. Marshall was hesitant, but indicated that if Ms. Taddeo's attendance issues improved, she would consider giving her overtime. Ms. Marshall also provided Ms. Taddeo documentation for the Employee Assistance Program. While Ms. Marshall was out on FMLA leave, Ms. Taddeo was issued another document for poor performance, and subsequently met with Mr. Robinson, during which time she voiced new concerns, and was ultimately provided an accommodation to work on the night shift.

x.   Ms. Marshall must "connect with Mariela and Mandy" to "develop process for updating insurances" and "ensure it is documented."

    a.   <u>Objection/Response</u>: Ms. Marshall met with Mariela Ferretti ("Ms. Feretti") and Mandy Chacon ("Ms. Chacon) from patient accounting in December, and a group email was established for WMC. Ms. Mackay indicated that she approved of patient accounting taking over this process.

xi.   Ms. Marshall must "enforce appropriate and timely documentation in notes."

    a.   <u>Objection/Response</u>: Without further clarification, or examples of prior poor performance, Ms. Marshall was unclear as to what her supervisors were looking for her to improve.

xii.   "501R reporting for financial assistance…must be better than last year."

    a.   <u>Objection/Response</u>: The 2019 reporting was pulled from the DOH data, an incorrect source for the information. As such, the 2020 comment codes were developed to better track for this required reporting. On or about January 18, 2022, during a call with leaders regarding Emergency Medicaid, Bob Samborski ("Mr. Samborski"), Program Coordinator, asked Ms. Marshall about this reporting, to which I provided an update, and Ms. Mackay approved of.

xiii.   "As a leader, there should always be a strategic approach to managing your areas of responsibility. Not all elements can be clearly outlined. Managing the daily operations and being able to clearly identify and articulate opportunities of risk and

improvement are major aspects of your responsibilities as the Manager of Patient Access at MHRH."

    a.  <u>Objection/Response:</u> This vague area of focus provided unmeasurable criteria for Ms. Marshall to improve upon.

54. In one final blow, Mr. Robinson included a section titled "monitoring the PIP," which proclaimed that "[i]mprovement must occur immediately and must be maintained. If any portion of this improvement plan is violated at any time during the specified timeframe, disciplinary action to include separation from the company may occur."

55. Troublingly, Ms. Marshall received the foregoing PIP just three months after returning from FMLA-protected leave, despite a virtually non-existent negative performance history. Ms. Marshall was truly shocked to be put on a PIP since she had previously been acknowledged as exceeding all expectations in her 2019 performance review and had recently just successfully met five out the six categories of expectations in 2021.

56. In reviewing this PIP, Mr. Robinson chose not to meet with Ms. Marshall in person, but instead briefly discussed the terms over the phone. Ms. Marshall was distraught, and adamantly expressed disagreement with the seemingly pretextual "areas of focus." When Ms. Marshall became audibly upset, Mr. Robinson stated that Ms. Mackay had wanted him to issue this document back in October. When Ms. Marshall reminded Mr. Robinson that she had been on her FMLA leave in October, he stumbled, and claimed it must have been in November. The fact that her recent FMLA leave was discussed during this PIP review call, along with the temporal proximity between Ms. Marshall's protected leave, and the PIP are telling.

**VI.    <u>Though Unfortunately to No Avail, Plaintiff Engages in Protected Activity When She Alerted Her HR About the Company's Retaliatory Conduct Against Her</u>**

57. On February 3, 2022, Ms. Marshall again expressed her concerns about the PIP to Nancy Estremera ("Ms. Estremera") and Christina Brennan ("Ms. Brennan") of Labor Relations. Specifically, Ms. Marshall outlined that she felt as though she was being unfairly targeted shortly after returning from FMLA-protected leave. Moreover, Ms. Marshall explained that many of the thirteen areas of improvement were vague, unattainable, and difficult to measure. In particular, she raised concerns regarding the language of the final paragraph: "[i]f any portion of this improvement plan is violated at any time during the specified timeframe, disciplinary action to include separation from the company may occur."

58. Ms. Marshall also reminded Ms. Estremera and Ms. Brennan that she had a previously scheduled vacation for the dates of February 4, 2021 through February 14, 2021. Ms. Marshall was assured by Ms, Estremera that her PIP would be extended for seven days, to account for time that she would be out of the office, so that the PIP no longer ran from January 28, 2022, through February 28, 2022, but from January 28, 2022, until March 9, 2022. Ms. Brennan confirmed this via voicemail, in which she stated that Ms. Marshall could detail her concerns with the PIP in writing upon her return from vacation, and that they would schedule a meeting to discuss further action.

## VII.   Plaintiff Schedules Her FMLA-Protected Leave and Thereafter Continues to Suffer Retaliation, which Ultimately Leads to Her Unlawful Termination

59. On or about February 4, 2022, Plaintiff provided the company with the requisite 30 days' notice of her upcoming surgery for a left total hip replacement, scheduled for March 7, 2022. Ms. Marshall submitted the required FMLA paperwork to Mr. Robinson, which he acknowledged. On February 15, 2022, Ms. Marshall returned from vacation and resumed her duties. She scheduled

a meeting with Mr. Robinson to check in and discuss ongoing tasks.  To her dismay, Mr. Robinson cancelled their February 17th meeting.

60.     On February 22, 2022, Plaintiff drafted a four-page response to the PIP detailing her objections,[1] but nevertheless signed the document out of fear she would be considered insubordinate for not doing so. Ms. Marshall sent her objections via email to Mr. Robinson, Ms. Mackay, Ms. Estremera, and Ms. Brennan; Mr. Robinson subsequently acknowledged receipt via email. To Ms. Marshall's dismay, she did not ever hear back from anyone in Human Resources to schedule a meeting to discuss her concerns about the PIP.

61.     Perhaps even more telling, on February 24, 2022, Mr. Robinson ended their meeting half an hour early.  In short, since the PIP began, Ms. Marshall has been provided zero coaching, substantive discussion, or remedial feedback, and certainly no suggestions for improvement.

62.     On March 1, 2022, Ms. Marshall finally received a call from Ms. Brennan asking her to report to the Human Resources office for a meeting. Ms. Marshall gathered her objections to the PIP and expected to engage in a discussion about the vague and unreasonable PIP, notwithstanding her ongoing efforts to address each area of focus. While in the waiting room of Human Resources, Ms. Marshall received an email from Ms. Allison Chamberlaine ("Ms. Chamberlaine"), Leave Management Specialist, granting her approval for her second FMLA request related to her surgery scheduled for March 7, 2022.

63.     Once in the meeting, Ms. Marshall was handed a folder with a termination letter, and was told by Ms. Brennan, that she could either resign or accept the termination, but that she

---

[1] Since Ms. Marshall no longer has access to her work email or meeting notes, she was unable to provide the exact document that was sent on February 22, 2022. She was, however, able to recreate a list of her objections, which we have referenced, *supra.*

did not have to provide a response immediately. Ms. Marshall was completely shocked and taken aback. Without saying anything further, Ms. Brennan got up and escorted Ms. Marshall out.  Mr. Robinson was also present in the meeting but said not a word, and instead, stared at his phone.

64.     It was also at this time that Plaintiff learned that her unlawful termination was being mischaracterized as performance-related. It was also at this time that Plaintiff learned that her unlawful termination was being covered up under the guise of a performance-related issue. Specifically, when being escorted out, Ms. Marshall requested the Company's reason for terminating her employment, Ms. Brennan lackadaisically responded by stating "performance," with no further explanation.  Baffled, Ms. Marshall asked why the follow-up meeting to discuss the PIP had never been scheduled, and that she was still technically supposed to be on her PIP.

65.     Moreover, Ms. Marshall wondered how she was supposed to improve her allegedly deficient performance, without ever receiving any feedback from the Company, despite multiple attempts to reach out to her supervisors during her PIP. Absolutely distraught, Ms. Marshall felt as though she was being discriminated against for having engaged in protected activity – i.e., taking FMLA leave to address her disability. Afterall, prior to taking leave, Ms. Marshall had received a stellar performance review, and was not subsequently alerted to any issues in follow-up meetings with Mr. Robinson, so to say that her performance was lacking simply did not add up.

66.     The following day, on March 2, 2022, Ms. Marshall was further humiliated when she reported to Westchester Medical Center for pre-surgical testing, and had to face her own former staff. On March 7, 2022, Ms. Marshall was admitted for surgery on her left hip, and while her husband was waiting for her to emerge from the Operating Room, he retrieved her belongings from Human Resources.

67. After recovering from surgery for several weeks, on March 27, 2022, Ms. Marshall emailed Ms. Estremera to inquire as to when she would receive payout for the unused vacation days she had accrued. Ms. Estremera failed to give her the courtesy of a reply, so Ms. Marshall placed a follow-up call to payroll on April 7, 2022. Ms. Marshall was advised that she would not be paid out for any unused vacation time, and instead was told to contact Barbara Kukowski ("Ms. Kukowski"), Senior Vice President of Labor Relations and Deputy General Counsel. Ms. Marshall immediately contacted Ms. Kukowski, but was told that because she was terminated, and chose not to voluntarily resign, she lost the ability to be paid on her unused vacation days. Never once was this distinction explained to Ms. Marshall. Having accrued 220 hours, at a rate of $45.90/hour, Ms. Marshall was denied $10,098.

**FIRST CAUSE OF ACTION**
**Interference In Violation of FMLA, 29 U.S.C. § 2615(a)(1)**
***Against Defendant Westchester Medical Center Health Network***

68. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs of the Complaint as if fully set forth herein.

69. Section 2612(D) of the Family Medical Leave Act, states in pertinent part: "an eligible employee shall be entitled to a total of 12 work weeks of leave during any 12-month period … Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee."

70. Section 2615(a)(1) of the Family Medical Leave Act, states in pertinent part: "Interference with rights. Exercise of rights. It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."

71.     To state a prima facie claim for interference under the FMLA, a plaintiff must allege the following: "(1) that she is an eligible employee under the FMLA; (2) that the defendant is an employer as defined by the FMLA; (3) that she was entitled to take leave under the FMLA; (4) that she gave notice to the defendant of her intention to take leave; and (5) that she was denied to which she was entitled under the FMLA." *Graziadio v. Culinary Instit. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016).

72.     Upon information and belief, Plaintiff and Defendant WESTCHESTER MEDICAL CENTER are subject to the FMLA, respectively, as an eligible employee and covered employer.

73.     Plaintiff was entitled to take leave under the FMLA, as she had 27 remaining days out of the 12 weeks allotted for the year beginning August 9,2021 through August 9, 2022.

74.     Plaintiff gave notice of her intention to take FMLA leave on or about February 4, 2022, for surgery scheduled on March 7, 2022.

75.     Defendant WESTCHESTER MEDICAL CENTER interfered with Plaintiff's rights under the FMLA by terminating her employment on March 1, 2022, less than one week before her second approved leave was set to begin, effectively depriving her of her FMLA rights.

76.     As a direct and proximate result of Defendant's unlawful and wrongful actions or omissions against Plaintiff, as described herein, Plaintiff has sustained injuries and damages, including, but not limited to: (a) loss of earnings; (b) loss of career opportunities; (c) mental and emotional distress; (d) loss of reputation and esteem in the community; and (e) loss of ordinary pleasures of everyday life, including the opportunity to pursue the gainful occupation of her choice.

**SECOND CAUSE OF ACTION**
**Retaliation In Violation of FMLA, 29 U.S.C. §  2615(a)(2) and (b)**

*Against Defendant Westchester Medical Center Health Network*

77.     Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs of the Complaint as if fully set forth herein.

78.     Section 2615(a)(2) of the Family Medical Leave Act, states in pertinent part: "Discrimination. It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."

79.     To establish a prima facie case of FMLA retaliation, a plaintiff must establish that 1) she exercised rights protected under the FMLA; 2) she was qualified for her position; 3) she suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.  *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016) (quotation omitted).

80.     Plaintiff exercised rights protected under the FMLA by requesting leave on or about June 28, 2021, and a second time on February 4, 2022.

81.     Plaintiff consistently received positive performance reviews over the course of her employment, until she returned from her first FMLA leave and shortly thereafter received a performance review with baseless, negative comments and was subsequently placed on an unfounded Performance Improvement Plan (PIP).

82.     In response to Plaintiff's activities, which were protected conduct under the FMLA, Defendant WESTCHESTER MEDICAL CENTER wrongfully retaliated against Plaintiff by placing her on an unfounded Performance Improvement Plan (PIP), shortly after she availed herself of taking her first FMLA leave, by failing to engage in any substantive discussions to improve such allegedly deficient performance, and ultimately, by terminating Plaintiff after she requested a second FMLA leave.

83.     As a direct and proximate result of Defendant's unlawful and wrongful actions or omissions against Plaintiff, as described in this Complaint, Plaintiff has sustained injuries and damages, including, but not limited to: (a) loss of earnings; (b) loss of career opportunities; (c) mental and emotional distress; (d) loss of reputation and esteem in the community; and (e) loss of ordinary pleasures of everyday life, including the opportunity to pursue the gainful occupation of her choice

### THIRD CAUSE OF ACTION FOR
### Discrimination In Violation of NYSHRL, § 296(1)(a)
### *Against All Defendants*

84.     Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs of the Complaint as if fully set forth herein.

85.     By the actions detailed above, among others, Defendants have discriminated against Plaintiff in violation of the NYSHRL by, *inter alia*, denying her the equal terms and conditions of employment because of her disability (arthritis).

86.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief, in addition to reasonable attorneys' fees and expenses.

87.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of monetary damages and other relief.

88.     Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### Retaliation In Violation of NYSHRL
#### *Against All Defendants*

89.     Plaintiff hereby repeats and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

90.     By the actions detailed above, among others, Defendants have retaliated against Plaintiff based on her protected activities in violation of the NYSHRL, including, most recently, terminating Plaintiff's employment.

91.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

92.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of damages.

93.     Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTION
### Aiding And Abetting Unlawful Discrimination and Retaliation in Violation of the NYSHRL
#### *Against Defendants Robinson and MacKay*

94.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

95.     By the actions described above, among others, Defendants ROBINSON and MACKAY knowingly or recklessly aided and abetted and directly participated in the unlawful discrimination and retaliation to which Plaintiff was subjected in violation of the NYSHRL.

96.     As a direct and proximate result of Defendants ROBINSON and MACKAY'S unlawful conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

97.     As a direct and proximate result of Defendants ROBINSON and MACKAY'S unlawful conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of damages.

98.     Defendants ROBINSON and MACKAY'S unlawful and retaliatory actions constitute malicious, willful and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

A.  Declaring the acts and omissions complained of herein are in violation of the FMLA and NYSHRL;

B.  Enjoining and permanently restraining Defendant from the violations of the protections contained in the FMLA and NYSHRL;

C.  Awarding damages in an amount consistent with the evidence and according to proof, including, but not necessarily limited to, liquidated damages for two times the amount of back pay, interest on back pay, compensatory damages, and consequential damages as provided by the FMLA and NYSHRL;

D.  Directing Defendant to reinstate Plaintiff to the position she would have occupied, but for Defendant' discriminatory and retaliatory treatment; or, in the alternative, awarding Plaintiff front pay in an amount to be proven and determined at trial;

E.  Declaring Defendant's acts against Plaintiff as willful, wanton, and malicious, and directing Defendant pay Plaintiff punitive or special damages in an amount to be proven and determined at trial;

F.  Awarding interest on such damages at the legal rate from the date of judgment until paid;

G.  Awarding Plaintiff all reasonable expenses that were necessarily incurred in the prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by the FMLA and NYSHRL and;

H.  Ordering such other and further relief as the Court deems just and proper.


## DEMAND FOR JURY TRIAL

99.   Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.


Dated: September 19, 2022
            White Plains, New York                    Respectfully submitted,

                                                      **FILIPPATOS PLLC**
                                                      By: _/s/ Parisis G. Filippatos_
                                                      Parisis G. Filippatos
                                                      199 Main Street, Suite 800
                                                      White Plains, NY 10601
                                                      Tel: 914-984-1111
                                                      pgf@filippatoslaw.com

                                                      _Attorney for Plaintiff_